Filed 5/24/23  In re N.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re N.R. et al., Persons Coming Under the Juvenile Court Law. | C096991 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,  Plaintiff and Respondent,  v.  T.R.,  Defendant and Appellant. | (Super. Ct. Nos. JV2021-18-1 & JV2021-18-2) |

T.R. (mother), mother of the minors N.R. and S.M., appeals from the juvenile court's orders terminating parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  She contends the juvenile court erred in failing to apply the

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

beneficial parental relationship exception to adoption. Finding no error, we will affirm the juvenile court's orders.

FACTUAL AND PROCEDURAL BACKGROUND

The minors have been involved with the Yolo County Health and Human Services Agency (Agency) since their birth. N.R. was born in November 2012 and, as a result of mother's methamphetamine use, was the subject of a voluntary family maintenance case. The case was closed in July 2013 but, after S.M.'s birth in June 2014, both minors were removed from mother's custody, again for reasons related to mother's methamphetamine use, as well as the deplorable condition of the home. Mother was provided reunification services and regained custody in April 2015. After six months of family maintenance services, the case was closed in October 2015.

The instant dependency proceedings were instituted in February 2021 with the filing of a section 300 petition after several domestic violence incidents and reports that mother had resumed methamphetamine use. The minors' infant sibling had also recently died while in the care of mother and the sibling's father, but this was not used as a basis for jurisdiction.

The minors were initially detained and placed with the maternal grandmother but later moved to the home of the maternal grandfather, who was the preferred placement of the minors' Indian tribe. The juvenile court adjudged the minors dependent children of the court and ordered them removed from mother's custody on March 15, 2021. It further ordered mother be provided with reunification services.[2] Supervised visitation was set at nine hours a week. Mother appealed the jurisdictional and removal orders and we affirmed. (*In re N.R. et al.* (Dec. 8, 2021, C093954) [nonpub. opn.].)

_____

[2] Services were initially provided for N.R.'s father but the Agency was unable to locate him, and his services were ordered terminated at the six-month review hearing. Neither minors' father is a party to this appeal.

At the six-month review hearing in September 2021, the Agency reported mother was attending grief counseling, but not participating in her other case plan services. Mother's visits with the minors were occurring weekly for six hours.[3] Three hours were supervised by the Agency in mother's home and the other three hours were supervised by the maternal grandfather. The Agency and maternal grandfather stated the visits "tend to go well" and there were no concerns. During visits, mother provided food and activities for her children such as art, movies, and swimming or going to the park. The minors were reported to enjoy the visits. Both minors were attending grief counseling. The juvenile court continued mother's reunification services.

At the time of the 12-month review hearing, mother had still only participated in grief counseling and had failed to participate in any of her other ordered services. She had refused to meet with the social worker, complete parenting classes, attend substance abuse treatment, or participate in random drug testing as directed. She was attending nine hours of supervised visitation per week and the visits continued to go well. The minors enjoyed themselves and appeared happy during the visits. Mother continued to bring the minors food and plan activities. N.R. required further grief counseling and was seeing a psychiatrist to work on addressing his anger and frustration. S.M. was also continuing grief counseling. The juvenile court terminated mother's reunification services and set a section 366.26 hearing for July 2022.

The contested section 366.26 hearing took place on August 15, 2022. The minors remained placed with their maternal grandfather. The Agency recommended the termination of parental rights with a permanent plan of adoption. The tribal representative attested that the tribe was in agreement with the recommendation to

---

[3]     It was subsequently reported that mother was visiting for nine hours each week during this period: six hours supervised by the Agency and three hours supervised by the maternal grandfather.

terminate parental rights, that the maternal grandfather was the tribe's preferred placement, that active efforts had been provided, and that continued custody by mother was likely to result in serious emotional or physical damage to the minors.

N.R. was continuing to see his psychiatrist to address his anger and frustration. S.M. was also being provided therapeutic support from a psychiatrist. Both minors also required continued grief counseling. The maternal grandfather and step-grandmother were willing, and expressed a strong desire, to provide permanency in the form of adoption. The minors had been placed in their home for 16 months, but the grandfather has had a relationship and regular contact with the minors since their births. Both minors had been developing well in their care and the interactions with their caregivers were described as "pleasant and conducive to their mental and emotional well-being." The caregivers were attuned to, and were meeting, the minors' needs and both minors had expressed that they feel safe with their maternal grandfather. The home was providing the minors with a stable and nurturing environment. The adoption home study was completed, and the maternal grandfather and his home were found suitable for adopting the minors.

N.R. had expressed some frustration about not reunifying with mother but had accepted his grandfather as a caregiver and had positive things to say about their relationship. N.R. said he agreed with the adoption but needed more time to prepare and think about it. He appeared relieved to know that adoption finalization was an event that would happen in the future so he would have more time to prepare. He was also continuing to participate in therapy where he would be able to process his current circumstances regarding adoption. N.R. said he felt safe with the maternal grandfather with whom he appeared to have a positive and trusting relationship and substantial emotional ties. The adoption specialist and adoption supervisor opined it would not be detrimental to N.R. to terminate paternal rights but it would be seriously detrimental to the minor's well-being to remove him from maternal grandfather's care.

4

S.M. (age eight) also accepted his maternal grandfather as a caregiver, felt safe with him, enjoyed participating in activities with him, and had positive things to say about their relationship. He would, however, like to return to mother's care or be in the care of his maternal grandmother. His reasons for preferring not to live with the maternal grandfather were that he would like to spend more time with the maternal grandmother, and that he has to attend Catholic school, which requires he wear a uniform and comply with a lot of rules and praying. S.M. did not, however, have any serious concerns or worries about remaining with the maternal grandfather for purposes of adoption. He, too, was continuing to participate in therapy and was processing his current circumstances and future adoption. Like his half-brother, S.M. was reported to have a positive and trusting relationship with, and substantial emotional ties to, his maternal grandfather. S.M.'s relationship with the maternal grandfather was assessed as meeting his needs. The adoption specialist and adoption supervisor opined it would not be detrimental to S.M. to terminate paternal rights but it would be seriously detrimental to the minor's well-being to remove him from maternal grandfather's care.

Mother had continued to attend nine hours of supervised visitation per week. The visits were reported to go well, with the minors enjoying the visits. Some of mother's visitation time was spent attending the minors' extracurricular sports activities. The maternal grandfather stated the minors love and miss mother and reported that there were, at times, some setbacks after visits with her where the minors' behavior would be harder to manage. They did not, however, cry or appear upset when the visits ended. The maternal grandfather was willing to facilitate post-adoptive contact with mother and intended to keep it around the same frequency, but with more flexibility to accommodate the minors' activities. The minors would also grow up together in the maternal grandfather's home and would be provided the opportunity to remain in contact with their extended family and tribe.

The maternal grandfather also testified that he had to do a lot to stabilize the minors when they were placed with him, both academically and behaviorally. In his opinion, the minors were concerned with whether they would have a chance to live with mother if she were to start doing what she needs to do. They have been blaming themselves for why they cannot live with mother. The adoption specialist tried to assure them they were not to blame. Maternal grandfather believed the minors were fine with proceeding with the adoption if they think they can live with mother again someday if she does what she needs to do.[4] Their tribe has a procedure for this to occur, but it is conditioned on the maternal grandfather's agreement and the mother's strict compliance with the juvenile court's earlier reunification plan services. In contrast, he believed the unrestricted access to petition for custody that a regular legal guardianship (rather than adoption) would permit, would be hard on the minors. Regardless, he could handle the minors' reactions to not being returned to mother's care as he was already doing that.

Mother's counsel argued the mother's parental rights could not be terminated based on an unenforceable promise of future contact and that there was no guarantee the maternal grandfather would continue to permit her to visit or would permit her to petition the tribe if she changed her behavior. Counsel argued that termination of parental rights would be detrimental to the minors, even though the mother could not provide a home for them. In the end, the attorney requested the juvenile court find the beneficial parental relationship exception to adoption applied and order a plan of legal guardianship with the maternal grandfather.

---

**4** This was described by counsel as a procedure within the tribe that permits, under certain circumstances, the biological parent to regain legal guardianship. This is also consistent with Probate Code sections 1500.1, 1510, 1514, which provides for the nomination of a suitable guardian in accordance with the minors' best interests.

6

Minors' counsel argued there had been no evidence of a positive emotional attachment; happy visits did not equate to a substantial positive relationship. Counsel argued that the minors' wishing they could go back to mother did not mean there was a positive emotional attachment and that such hope, at this point, was detrimental to them. The maternal grandfather had provided the stability and mental health support the minors needed and would be able to support the minors as they dealt with the loss of their legal relationship with mother. Even assuming the minors would not have continued future contact with mother, the benefits of adoption outweighed any possible detriment resulting from the termination of parental rights.

The juvenile court began by noting that the focus of the hearing was not the success or failure of mother's efforts, but the minors' need for stability. It found mother had visited regularly but that there was a substantial argument that mother's relationship with the minors was not a parental relationship, but more of a friendship or visitor relationship. Although the minors call her their mother and "love her dearly," she has never provided them with any of the things a parent normally would provide. She did not meet their emotional needs or their educational needs. She loves that she has children and likes to spend time with them, but she does not take any responsibility for them nor care enough to try to address her problems to regain custody. The juvenile court found she did not have a parental bond within the meaning of the exception. The court further found that, not only would maintaining their relationship with mother not benefit the minors to such an extent as to outweigh the benefits of adoption and greatly harm the minors, it found "exactly the opposite" to be the case — that "termination of parental rights would greatly benefit [the minors]" by giving them the stability they have been missing their entire lives.

The juvenile court then noted that mother was lucky that her father was willing to do what he was saying he was willing to do because she had "done nothing to deserve what he's offering her. She cannot provide for these children. She does not have that

parental bond with them that would make an exception whatsoever, and yet she has a father who is willing to continue to let her visit, to even make available the possibility of the children returning to her if she ever can put herself in a position where she can actually be a mother." Finding clear and convincing evidence the minors are adoptable and finding the beneficial parental relationship exception not to apply and taking the minors' wishes into consideration, the court terminated parental rights. It ordered any future visitation to be completely at the discretion of the caregiver.

On August 26, 2022, the juvenile court granted mother's motion to reopen evidence, as mother's counsel had forgotten to submit visitation logs at the contested hearing. The visitation logs were admitted into evidence without objection, and the juvenile court set the matter for ruling on September 7, 2022. The visitation logs submitted by mother spanned from the end of January 2022 to the end of May 2022. No visitation logs were introduced regarding visits from June, July, or August. All the visits appeared fairly consistent: The minors were happy to see mother and appeared comfortable with her. Mother brought food and provided appropriate activities. She was verbally and physically affectionate toward the minors but there were only a few references to the minors reciprocating her affection. It was also regularly observed that the minors would fight with or hit each other during the visits and refuse to listen to mother, and that N.R., in particular, often struggled with his behavior toward mother, being rude or yelling. There were no reports that the minors struggled with separating at the end of visits or that they expressed the desire not to leave mother or that they had missed her.

On September 7, 2022, the juvenile court confirmed its prior ruling terminating parental rights. It reviewed the visitation logs and, while the logs confirmed that she visited regularly and she was a good friend, it concluded they did not show a parental bond.

8

Mother timely appealed; the case was fully briefed and assigned to this panel in April 2023.  The parties did not request oral argument.

DISCUSSION

Mother contends the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied.  We find no error.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*.  [Citation.]'  [Citation.]  If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child."  (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)  There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child."  (§ 366.26, subd. (c)(1)(B).)  One such circumstance is the so-called beneficial parental relationship exception.  (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to the termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).)  The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Caden C.*, at p. 636.)

9

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the fact that mother maintained consistent visitation with the minors was undisputed. However, it is not enough for a parent to show frequent and loving contact during pleasant visits. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) As for the second and third elements, the juvenile court concluded mother did not meet her burden to establish the minors have a significant, positive, emotional attachment with her or that the harm the minors would experience if the parental relationship were terminated outweighs the benefits that would be provided by an adoptive home. (*Caden C., supra,* 11 Cal.5th at pp. 633-634.)

To support her position that these young minors have a substantial, positive emotional attachment with her, mother argues that she raised them for the initial eight (N.R.) and six (S.M.) years of their lives. While the minors were in her care for most of that time, the time was not one of stability or positivity. They were removed from her care for a year shortly after their birth, and their time with mother included exposure to substance abuse and domestic violence and ended with the death of their infant sibling. The mere fact that they spent the majority of their childhood in her custody does not, under the circumstances here, establish, ipso facto, that they have a substantial, positive emotional attachment to her. In this case, it resulted in the need for the maternal

grandfather to expend significant efforts to stabilize the minors, both academically and behaviorally, which he, not mother, had been successfully doing for the past year and a half.

Nor is the fact that the minors enjoyed visits and were happy to see mother sufficient to establish that the minors have a substantial, positive emotional attachment to her. For the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than that of a friendly visitor or friendly nonparent relative, such as a grandparent or aunt. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) "[A]n emotional attachment is one where the child views the parent as more than a mere friend or playmate." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) While mother provided limited care and entertainment during her visits, there was no evidence that separating from mother at the end of visits caused any emotional trauma. The minors missed mother but did not ask for more frequent, longer, or overnight visits. The juvenile court found the minors considered mother more of a friend they enjoyed visiting than a parent to whom they were attached.

Finally, neither the fact that the minors love mother nor that they hoped to be returned to her custody someday are sufficient evidence of their substantial, positive emotional attachment to mother. While the minors do love mother, they also blame themselves for her inability to regain custody. Their continued relationship with mother has resulted in their continued but unfulfilled hope that she will do what it takes to regain custody, and in N.R.'s frustration and anger that she continually does not. This is not the type of substantial *positive* attachment the exception contemplates. "A 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' [Citation.] A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing *and provides the child with a sense of security and stability*." (*In re B.D., supra*, 66 Cal.App.5th at p. 1230, citing *In re Autumn H., supra*, 27 Cal.App.4th at

11

p. 575, italics added.) The minors' relationship with mother does not provide them with a sense of security and stability; it provides them with *insecurity* and *instability*.

A parent-child relationship sometimes "involves tangled benefits and burdens" and "[i]n those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C., supra*, 11 Cal.5th at p. 634.) The "positive" or "negative" effect of interaction between parent and child is one of the factors to consider in assessing the relationship. (*Caden C.,* at p. 632, quoting *In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) Here, although the visits were reported to go well and no safety concerns were noted by the monitors, the minors were also reported to have some problematic behaviors following visits with mother, and the visits were often peppered with the minors fighting, not listening to mother, or even being rude to or yelling at mother. Moreover, the juvenile court found the continuing relationship with mother, and the minors' unfulfilled desire that mother's life circumstances and behavior would improve was detrimental to them and resulting in instability and insecurity. Thus, while the evidence established a bond between the minors and mother, the nature of the bond was not entirely positive.

However, even assuming mother established her relationship with the minors was sufficiently significant and positive and that continued contact would benefit the minors, she failed to meet her burden to establish a detriment in terminating parental rights or that the detriment of termination outweighed the benefits of adoption. Mother had the burden of proof to affirmatively demonstrate that termination of the relationship would be detrimental to the minors. Yet, mother identified little evidence, if any, that termination of the parental relationship would be detrimental to the minors at all, let alone when balanced against the countervailing benefit of a new, adoptive home. (Compare *Caden C., supra*, 11 Cal.5th at pp. 627-628, 636 [relying on a bonding study concluding severing the parental relationship would be detrimental to the child].)

12

Mother did not testify at the hearing. While there was testimony that the minors love and miss mother, there was no testimony, nor any expert opinion, that the minors would suffer any detriment from the termination of parental rights. Indeed, the only evidence presented on the subject of detriment were the opinions provided by the adoption specialist and adoption supervisor who opined that terminating parental rights would *not* be detrimental to the minors and that adoption was in their best interests. The Agency, minors' tribe, the tribal expert, and minors' counsel were all in agreement that adoption was in the minors' best interests.

While mother is not required to procure a positive bonding study or present expert testimony, she nonetheless must meet her burden of proof. In light of the uncontradicted opinions here that termination of parental rights would not be detrimental, the positive interactions during visits, the minors' hope the mother's circumstances and behavior would improve, or even minors missing mother between visits, are insufficient to establish that losing the parent/child relationship would cause the minors to be greatly harmed.

Moreover, even assuming some detriment to the minors from termination of parental rights had been established, the juvenile court was required to weigh the harm to the minors of terminating their relationship with mother against the benefit to these minors of a permanent and stable home. (*Caden C., supra*, 11 Cal.5th at p. 631.) Only if severing the parent-child relationship would deprive the child of a substantial, positive emotional attachment such that termination would be harmful to the child, even considering the benefits of a new adoptive home, should the court not terminate parental rights. (*Id.* at pp. 631-632.) "[T]he ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Id*. at p. 640.) We will not disturb the juvenile court's decision unless it "exceed[s] the limits of legal discretion

13

by making an arbitrary, capricious, or patently absurd determination." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  We cannot find an abuse of discretion here.

The minors deserve the opportunity to be raised in a permanent, stable home environment under the care and custody of a stable nurturing parent whom they can count on to continue to provide them with the support they need.  They have been removed from mother's care twice and are doing well in maternal grandfather's stable and supportive care.  The instability of hoping mother will engage and regain custody is problematic for these minors, magnifying their instability.  There was little to no evidence of great harm or detriment to the minors in terminating parental rights.  The juvenile court did not err in declining to apply the beneficial parental relationship exception to adoption.

DISPOSITION

The orders of the juvenile court (terminating parental rights) are affirmed.


_____\s\_____
McADAM, J.*


We concur:


\_\_\_\_\_\s\_____
MAURO, Acting P. J.


\_\_\_\_\_\s\_____
DUARTE, J.

---

\*      Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.